UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

STATE OF MAINE,

    Plaintiff,

    v.

LIBERTY BELL MOVING & STORAGE, INC.; and KEVIN V. FINKENAUR,

    Defendants.

**COMPLAINT**
**INJUNCTIVE RELIEF SOUGHT**

Plaintiff State of Maine brings this action against Defendants Liberty Bell Moving & Storage, Inc. and Kevin V. Finkenaur, and alleges as follows:

I.    THE PARTIES

1.    Plaintiff State of Maine (the "State") is a sovereign state acting through its Attorney General, Aaron M. Frey, pursuant to the powers granted by the Consumer Review Fairness Act of 2016, 15 U.S.C. § 45b ("CRFA"), Section 4206 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, 49 U.S.C. § 14711, the Maine Unfair Trade Practices Act, 5 M.R.S.A. §§ 205-A – 214 (Westlaw June 27, 2022) ("UTPA"), and the common law of Maine.

2.    Defendant Liberty Bell Moving & Storage, Inc. ("Liberty Bell") is a Maine corporation with a place of business in Windham, Maine.

3.    Defendant Kevin V. Finkenaur ("Finkenaur," and, collectively with Liberty Bell, the "Defendants") is an individual residing in Cumberland County, Maine. At all times relevant to this Complaint, Finkenaur has been the President, a director, and an owner of Liberty Bell.

1

## II. JURISDICTION

4. The Court has subject matter jurisdiction over the claims asserted by the State in this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a). Counts I, II, and III assert claims arising under the laws of the United States. *See* 28 U.S.C. § 1331. Counts IV, V, VI, and VII assert supplemental state law claims that are so related to the claims asserted in the remaining Counts that they form part of the same case or controversy. *See* 28 U.S.C. § 1367(a).

5. The Court has personal jurisdiction over Defendants pursuant to 14 M.R.S.A. § 704-A (Westlaw June 27, 2022).

## III. STATUTORY BACKGROUND

A. The Consumer Review Fairness Act of 2016

6. The CRFA is a consumer protection statute that prohibits the use of "gag clauses" in form contracts. Specifically, the CRFA voids any provision of a form contract that:

   (A) prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication;

   (B) imposes a penalty or fee against an individual who is a party to the form contract for engaging in a covered communication; or

   (C) transfers or requires an individual who is a party to the form contract to transfer to any person any intellectual property rights in review or feedback content, with the exception of a non-exclusive license to use the content, that the individual may have in any otherwise lawful covered communication about such person or the goods or services provided by such person.

15 U.S.C. § 45b(b)(1).

7. It is unlawful to offer a form contract containing a provision declared void by the CRFA. 15 U.S.C. § 45b(c).

8. A "form contract" is any contract other than an employment or independent contractor contract with standardized terms "used by a person in the course of selling or leasing

the person's goods or services" and "imposed on an individual without a meaningful opportunity for such individual to negotiate the standardized terms." 15 U.S.C. § 45b(a)(3).

9. A "covered communication" is "a written, oral, or pictorial review, performance assessment of, or other similar analysis of, including by electronic means, the goods, services, or conduct of a person by an individual who is party to a form contract with respect to which such person is also a party." 15 U.S.C. § 45b(a)(2).

10. The CRFA authorizes state attorneys general to bring civil actions and to "obtain appropriate relief . . . in any case in which the attorney general of a State has reason to believe that an interest of the residents of the State has been or is threatened or adversely affected by the engagement of any person subject to [15 U.S.C. § 45b(c)] in a practice that violates such subsection." 15 U.S.C. § 45b(e).

11. A violation of 15 U.S.C. § 45b(c) is a violation of a rule defining an unfair or deceptive act or practice prescribed pursuant to 15 U.S.C. § 57a(a)(1)(B). 15 U.S.C. § 45b(d)(1).

B. <u>Consumer Protection Regulations Applicable to the Interstate Transportation of Household Goods by Motor Carriers</u>

12. Pursuant to 49 U.S.C. § 13301(a), the U.S. Secretary of Transportation "may prescribe regulations in carrying out" Title 49, Subtitle IV, Part B of the United States Code, a federal statutory framework regulating certain transportation operators in interstate commerce, including motor carriers.

13. It is unlawful for any person to employ any means to evade the regulation of carriers under Title 49, Subtitle IV, Part B of the United States Code. 49 U.S.C. § 14906.

14. The Secretary of Transportation has delegated the authority to prescribe regulations in carrying out Title 49, Subtitle IV, Part B of the United States Code to the Federal Motor Carrier Safety Administrator. 49 C.F.R. § 1.87(a)(2).

15. Pursuant to the authority delegated by the Secretary of Transportation, the Federal Motor Carrier Safety Administrator has prescribed consumer protection regulations, which are published at 49 C.F.R. Part 375 (hereafter referred to as "FMCSA Consumer Protection Regulations").

16. The FMCSA Consumer Protection Regulations apply to "a household goods motor carrier engaged in the interstate transportation of household goods . . . when offering . . . services to individual shippers." 49 C.F.R. § 375.101.

17. A "household goods motor carrier" (for purposes of this Complaint, "motor carrier") is "a motor carrier that, in the ordinary course of its business of providing transportation of household goods, offers some or all of the following additional services: (i) [b]inding and nonbinding estimates; (ii) [i]nventorying; (iii) [p]rotective packing and unpacking of individual items at personal residences; (iv) [l]oading and unloading at personal residences." 49 C.F.R. § 375.103.

18. An "individual shipper" is any person who "(1) is the shipper, consignor, or consignee of a household goods shipment; (2) is identified as the shipper, consignor, or consignee on the face of the bill of lading; (3) owns the goods being transported; and (4) pays his or her own tariff transportation charges." 49 C.F.R. § 375.103.

19. The FMCSA Consumer Protection Regulations establish that a motor carrier is "legally liable for loss or damage if it happens during performance of any transportation of household goods and all related services identified on your lawful bill of lading." 49 C.F.R. § 375.201(a).

20. In general, a motor carrier's liability

> is for the household goods that are lost, damaged, destroyed, or otherwise not delivered to the final destination in an amount equal to the replacement value of

> the household goods. The maximum amount is the declared value of the shipment. The declared value is subject to rules issued by the Surface Transportation Board (STB) and applicable tariffs.

49 C.F.R. § 375.201(b). This liability is referred to by the FMCSA Consumer Protection Regulations as a motor carrier's "Full Value Protection Obligation."

21. A shipper may waive the motor carrier's Full Value Protection Obligation. The waiver must be in writing. In the event of such a waiver, the motor carrier remains "liable for loss of, or damage to, any household goods to the extent provided in the STB released rates order." 49 C.F.R. § 375.201(c).

22. A motor carrier must disclose to the shipper, in a clear and concise manner, the limits of the motor carrier's liability. 49 C.F.R. § 375.201(e).

23. Because a motor carrier must either comply with the Full Value Protection Obligation or, if the Full Value Protection Obligation is properly waived, provide liability protection based on the Surface Transportation Board's released rates, a motor carrier may not require a shipper to release or discharge the motor carrier or its agent from all liability.

24. The FMCSA Consumer Protection Regulations also expressly prohibit a motor carrier from requiring a shipper to release or discharge the motor carrier from all liability in a delivery receipt or shipping document. 49 C.F.R. § 375.701(a).

25. Before a motor carrier executes an order for service for a shipment of household goods, a motor carrier must provide a shipper with a written estimate of the total charges and indicate whether it is a "binding" or a "non-binding" estimate. 49 C.F.R. § 375.401(b).

26. A binding estimate

> is an agreement made in advance with [the] individual shipper. It guarantees the total cost of the move based upon the quantities and services shown on [the] estimate, which shall be based on the physical survey of the household goods, if required. [The motor carrier] may impose a charge for providing a written

> binding estimate. The binding estimate must indicate that [the motor carrier] and the shipper are bound by the charges.

49 C.F.R. § 375.401(b)(1).

27. A non-binding estimate

> is what [the motor carrier] believe[s] the total cost will be for the move, based upon both the estimated weight or volume of the shipment and the accessorial services requested and the physical survey of the household goods, if required. A non-binding estimate is not binding on [the carrier]. [The motor carrier] will base the final charges upon the actual weight of the individual shipper's shipment and the tariff provisions in effect. [The motor carrier] may not impose a charge for providing a non-binding estimate.

49 C.F.R. § 375.401(b)(2).

28. A motor carrier may not amend an estimate after a shipment of household goods is loaded. 49 C.F.R. § 375.401(i).

29. Subject to exceptions for the cost of additional services requested by a shipper and charges for impracticable operations, a motor carrier may not condition the delivery of a shipment of household goods on payment of more than the amount of a binding estimate or 110% of the amount of a nonbinding estimate. 49 C.F.R. §§ 375.407(a), 375.703.

30. A motor carrier must prepare a written, itemized inventory for each shipment of household goods before or at the time of loading and must provide the shipper with a copy signed by the motor carrier and the shipper. 49 C.F.R. § 375.503.

31. A state attorney general may enforce by civil action the consumer protection provisions of Title 49 of the United States Code, including the FMCSA Consumer Protection Regulations, and obtain all appropriate relief with respect thereto. 49 U.S.C. § 14711.

    C.    <u>The Maine Unfair Trade Practices Act</u>

32. Pursuant to the UTPA, "unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful," and "it is the intent of the Legislature that in construing

this section the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to Section 45(a)(1) [sic] of the Federal Trade Commission Act (15 United States Code 45(a)(1)), as from time to time amended." 5 M.R.S.A. § 207.

33. 15 U.S.C. § 45(a)(1) is the analog federal provision to 5 M.R.S.A. § 207.

34. Pursuant to the UTPA:

> Whenever the Attorney General has reason to believe that any person is using or is about to use any method, act or practice declared by section 207 to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the State against such person to restrain by temporary or permanent injunction the use of such method, act or practice and the court may make such other orders or judgments as may be necessary to restore to any person who has suffered any ascertainable loss by reason of the use or employment of such unlawful method, act or practice, any moneys or property, real or personal, which may have been acquired by means of such method, act or practice.

5 M.R.S.A. § 209.

35. Pursuant to the UTPA:

> In any action by the Attorney General brought against the defendant for violating the terms of an injunction issued under this section, the court may make such orders or judgments as may be necessary to restore to any persons who have suffered any ascertainable loss by reason of such conduct found to be in violation of an injunction, any money or property, real or personal, which may have been acquired by means of such conduct.

5 M.R.S.A. § 209.

36. Each intentional violation of 5 M.R.S.A. § 207 is a civil violation for which a penalty of up to $10,000 may be imposed. 5 M.R.S.A. § 209.

37. Should the State prevail in an action brought pursuant to 5 M.R.S.A. § 209, it is entitled to recover its litigation costs, including court costs, reasonable attorneys' fees, and reasonable expert witness fees. 14 M.R.S.A. § 1522(1)(A) (Westlaw June 27, 2022).

## IV. FACTUAL ALLEGATIONS

38. Since 2011, Liberty Bell has provided moving and transport services to customers who are moving property, including household goods, within Maine, from Maine to another state, and from another state to Maine. Liberty Bell's business has included preparing, loading, transporting, unloading, and storing its customers' household goods and other property.

39. Finkenaur is the President, a director, and an owner of Liberty Bell. At all times relevant to this Complaint, Finkenaur actively participated in and/or directed and/or controlled the acts and practices of Liberty Bell alleged herein.

40. For several years, Liberty Bell has used a document identified as an "Order for Service" to offer its transport services to potential customers. The Order for Service describes the services Liberty Bell offers to perform and the terms under which it will agree to perform those services.

41. The Order for Service is either a Binding Order for Service ("Binding OFS") or an Hourly Order for Service ("Hourly OFS"). A true and correct copy of an example of a Binding OFS used by Liberty Bell, with customer information redacted, is attached hereto as Exhibit 1. A true and correct copy of an example of an Hourly OFS used by Liberty Bell, with customer information redacted, is attached hereto as Exhibit 2.

42. Both the Binding OFS and Hourly OFS contain standardized terms.

43. Both the Binding OFS and Hourly OFS contain a section with the heading "Additional Valuation Pricing." In this section, Liberty Bell offers customers three options for "Valuation Protection," which is a statement of the extent of Liberty Bell's liability to the customer for property that is damaged, lost, or misplaced in the course of transport.

44. The three "Valuation Protection" options offered by Liberty Bill are (1) "Full Valuation Protection" or "FVP," (2) "Released Valuation Protection" or "RVP," and (3) "No Valuation Protection" or "NVP."

45. Full Valuation Protection is described as "cover[ing] costs resulting from potential damages to your furnishings during your move.  Should damage, loss, or theft occur during your move, resulting damage would be fully covered by Liberty Bell Moving."

46. Released Valuation Protection is described as follows: "If you don't want to purchase FVP, we can move your belongings under the 'released valuation' of .60 cents per lb.  The released valuation reimburses you at the rate of .60 cents per lb., per piece, should damage, lost items, or theft occurs [sic]."

47. With respect to Released Valuation Protection, both the Binding OFS and Hourly OFS also provide as follows:

> Released valuation covers all your furnishings and boxes packed by Liberty Bell Moving & Storage.  The contents of the boxes packed by you, mattresses or box springs not in bed bags, un-shrink wrapped [sic] upholstered furniture, particle board furniture, improperly packed items such as lamps, lamp shades, vases, mirrors/dressers and/or vanity mirrors, artwork, electronics, and/or glass item/piece are not covered under ANY CIRCUMSTANCES by RVP.

48. No Valuation Protection is described as follows:

> By selecting this option, you are releasing Liberty Bell Moving & Storage from ANY AND ALL CLAIMS for lost, damaged or misplaced items.  Under no circumstances will we honor any claims whatsoever for alleged damage, lost or misplaced items.

49. The No Valuation Protection provision also purports to penalize the customer for publishing a negative review of Liberty Bell and threatens legal claims, including punitive damages, as follows:

> Any bad reviews posted against Liberty Bell on any social media platform or other review sites due to alleged damage, or lost items will be deemed false and

9

defamatory. Any such false and defamatory remarks are [sic] made against Liberty Bell Moving & Storage will make the signer of this document liable in court for punitive damages for making these false allegations.

50. The No Valuation Protection or NVP provision also requires the customer to stipulate to facts that would exempt Liberty Bell from the FMCSA Consumer Protection Regulations with respect to the move, even if those facts are untrue:

> By selecting this option, you are also declaring this move does not technically meet the FMCSA standards for Household Goods, thus does not require an inventory per the FMCSA rules.

51. Liberty Bell's pricing for a move changes depending on the level of "Valuation Protection" selected by the customer. Full Valuation Protection or FVP is the most expensive, followed by Released Valuation Protection or RVP, and then No Valuation Protection or NVP.

52. Both the Binding OFS and Hourly OFS also contain the following provision:

> If the customer or their agents leave the movers unattended at the Origin or destination and the movers get done loading or unloading [sic] leave before the customer or their agent return, Liberty Bell is not responsible in ANY WAY for items left behind, not put in proper location or any other issues that arise from not having somebody there to instruct the movers or to do a final walkthru [sic] when they get done. Any bad reviews left on line [sic] when this situation arises, will make the customer or agent of the customer liable defamtion [sic], and for punitive damages in court as the result of the defamation.

53. Additionally, the Hourly OFS contains the following provision:

> IF THE LOAD DATE OR UNLOAD IS NOT ABLE TO BE MET BY LBMS FOR ANY REASON, THE CUSTOMER CAN REQUEST THAT THE MOVE BE CANCELED AT ANY TIME BEFORE LOADING BEGINS, AND FULL REIMBURSEMENT OF THE DEPOSIT WILL BE GIVEN. HOWEVER, IF THE MOVE IS NOT CANCELED BEFORE LOADING, AND LSMS [sic] EXECUTES THE MOVE ON DATE(S) OTHER THAN THE ONE(S) AGREED TO ON THE OFS, THE CUSTOMER WILL BE LIABLE TO PAY THE BILL IN FULL BEFORE UNLOADING AT DESTINATION. IN ADDITION TO THE FULL AMOUNT DUE BEING PAID TO LBMS, THE CUSTOMER AGREES NOT TO WRITE NEGATIVE REVIEWS DIRECTED AT LBMS ON ANY REVIEW SITES, SOCIAL MEDIA PLATFORMS OR ANY OTHER INTERNET BASED REVIEW SITE. IF NEGATIVE REVIEWS ARE LEFT, THIS WILL BE GROUNDS FOR A DEFAMATION LAWSUIT TO BE BROUGHT AGAINST THE CUSTOMER WHOSE NAME IS LISTED ON

THE OFS OR PARTIES DIRECTLY RELATED TO THE CUSTOMER NOTED ON THE OFS.

54.     The Hourly OFS also contains the following provision:

By electronically signing this OFS, if you opted for less expensive hourly or nonbinding pricing.  You must understand that we're do [sic] the [sic] ing [sic] this move site [sic] unseen and are not guaranteeing that we will be able to honor the exact load date noted on the OFS.  While it is ALWAYS our intention to honor date(S) noted on the OFS, sometimes due to FMCSA drive time regulations beyond our control, this is not always possible.  Therefore, you or anyone affiliated with you agree to note post ANY NEGATIVE REVIEWS against Liberty Bell Moving & Storage whatsoever.  Any bad reviews posted against Liberty Bell Moving & Storage on any social media platform or review sites will be deemed false and defamatory thus making the signer of this document liable in court for punitive damages.  Also, a $1000 defamation management fee will be added to the cost of the move if negative reviews are not removed after 3 days from being posted.  You will be notified of this from attorney@libertybellmoving.com.  This stipulation does not apply for Binding estimates where a pre move walk thru [sic] has been conducted, and a date guarantee surcharge added to the binding estimate.

55.     Contrary to the express provisions of the Binding OFS and Hourly OFS prohibiting negative reviews, Liberty Bell's publicly available website falsely advertises that "[w]e encourage our customers to leave honest reviews of their experience with us. . . .  Your moving company ratings feedback for us is crucial to our success."

56.     Rather than engaging in constructive responses to negative reviews by customers, for several years and continuing to the present Defendants have had a regular practice of actively combatting negative reviews by threatening customers with liability, lawsuits, and penalties for posting negative reviews of Liberty Bell's business, employees, and/or services.  These threats are based on the provisions contained in Orders for Service as described above.

57.     These threats to customers are often communicated by email, including from the email address attorney@libertybellmoving.com.

58.     The threatening emails from the attorney@libertybellmoving.com email address utilize pre-formatted language identical or substantially similar to the following:

> We have received pre authorized permission from our attorneys [sic] office to proceed with a defamation court filing if the online review you left is not removed.  Please see the attached screenshots from the contract and terms you agreed to.  The OFS states that any bad reviews left regarding hourly or non binding [sic] jobs, will be deemed as defamation.  Liberty Bell believes that the review is false and defamatory and is in violation of the non-disparagement provision that you freely and voluntarily agreed to.  We intend to pursue its [sic] rights unless you agree to remove the review voluntarily.
>
> As you know, defamation **is not protected by the First Amendment.** Furthermore, the CRFA (consumer review fairness act) does not apply here.  The CRFA applies only to "form contracts" that are "imposed" on an individual without a meaningful opportunity for such individual to negotiate the standard terms."  In this case, you had a full opportunity to choose whether to accept the non-disparagement provision or not.  If you did not wish to agree to the non-disparagement provision, you could simply [sic] requested a binding estimate, which would have offered you a binding price.  This being said, you voluntarily accepted the non-disparagement provision.  Since You had the full opportunity to negotiate and decline the non-disparagement provision, it was not "imposed on" you, and the CRFA does not apply.  Non-disparagement provisions are commonly used and legally enforceable.
>
> If the review is not removed by 12:00PM on [date], or other reviews are left on other social media platforms, we will proceed with filing the defamation case in court, with the documents attached here.
>
> We will seek *$2500 per day the review(s) are left up*, and will also seek to be reimbursed for **lawyer fees upwards of $9500**, which you also agreed to pay by digitally signing the OFS.  If the review (s ) are not down by 12:00pm on [date], we will file this lawsuit.  Once the lawsuit is started, we ***WILL NOT*** remove the lawsuit even if the reviews are taken down after the [date] deadline.
>
> NOTE** The contract states that if negative reviews are left, a $1000 defamation fee is charged.
>
> Just like past due balances, the defamation fee is subject to the same %2.5 [sic] interest rate that is compounded daily.  After 30 days, this will essentially double the amount $2000 [sic].

59. The threatening emails from the attorney@libertybellmoving.com email address have at times identified the sender as "Attorney, Liberty Bell Moving & Storage," "Heinrich," and "Reinhard."

60. On information and belief, Liberty Bell does not employ an in-house attorney.

61. On information and belief, Liberty Bell's outside counsel has not and does not use the attorney@libertybellmoving.com email address to send emails.

62. On information and belief, there is no attorney authorized to practice law in the Maine with Heinrich or Reinhard as a first or last name.

63. On information and belief, the attorney@libertybellmoving.com email address is under the use and/or control of Finkenaur and/or a Liberty Bell employee and/or employees over whom Finkenaur has managerial control and responsibility, none of whom are attorneys.

64. On information and belief, the emails from the attorney@libertybellmoving.com email address to Liberty Bell's customers are not authored or sent by attorneys authorized to practice law in the State of Maine.

65. Defendant have recently leveraged threats against Liberty Bell's customers to induce the customers to remove negative reviews, despite the customers' protestations that the reviews were honest and legitimate assessments of their experience with Liberty Bell.

66. Defendants have recently threatened customers who have published negative reviews with fees, penalties, and costs that are unenforceable or legally and/or factually baseless, including liquidated "punitive" damages, defamation "fees," court fees that exceed the amounts that could be assessed by a court, and attorneys' fees that are substantially inflated, not yet incurred, and/or not reasonable based on the claims asserted.

## COUNT I
### Violations of the Consumer Review Fairness Act

67. The State incorporates herein the allegations of the foregoing paragraphs.

68. Since the date that is 90 days after December 14, 2016 and continuing to the present day, Defendants in their trade or commerce have offered customers form contracts containing provisions declared void by 15 U.S.C. § 45b(b)(1).

69. By offering customers form contracts containing provisions declared void by 15 U.S.C. § 45b(b)(1), Defendants have violated 15 U.S.C. § 45b(c).

## COUNT II
### Violations of FMCSA Consumer Protection Regulations

70. The State incorporates herein the allegations of the foregoing paragraphs.

71. At all times relevant to this Complaint Liberty Bell has been a motor carrier engaged in the interstate transportation of household goods.

72. At all times relevant to this Complaint, Liberty Bell has offered and provided interstate transportation of household goods services to individual shippers.

73. At all times relevant to this Complaint, Defendants have offered and entered into contracts with individual shippers that purport to provide no liability protection in the event household goods are lost, damaged, destroyed, or otherwise not delivered to the final destination. By doing so, Defendants violated the requirement established by the FMCSA Consumer Protection Regulations that a motor carrier must comply with the Full Value Protection Obligation, or, if the Full Value Protection Obligation is waived in writing by the individual shipper, value protection at released rates.

74. At all times relevant to this Complaint, Defendants have offered and entered into contracts by which individual shippers agree to release and discharge Liberty Bell from any

claims whatsoever. By doing so, Defendants violated the requirement established by the FMCSA Consumer Protection Regulations that a motor carrier must comply with the Full Value Protection Obligation, or, if the Full Value Protection Obligation is waived in writing by the individual shipper, value protection at released rates.

75. At all times relevant to this Complaint, Defendants have offered and entered into contracts with individual shippers which purport to eliminate Liberty Bell's liability for damage to furnishings and items in boxes that were not packed by Liberty Bell. By doing so, Defendants violated the FMCSA Consumer Protection Regulations.

## COUNT III
Violations of 49 U.S.C. § 14906

76. The State incorporates herein the allegations of the foregoing paragraphs.

77. At all times relevant to this Complaint, Defendants have offered and entered into contracts with individual shippers that seek to exempt Liberty Bell from or otherwise disclaim or avoid the FMCSA Consumer Protection Regulations when those regulations in fact apply. By doing so, Defendants have employed a means to evade the regulation of carriers under Title 49, Subtitle IV, Part B of the United States Code, and have therefore violated 49 U.S.C. § 14906.

## COUNT IV
Violations of the Maine Unfair Trade Practices Act

78. The State incorporates herein the allegations of the foregoing paragraphs.

79. At all times relevant to this Complaint, Defendants in their trade or commerce have offered customers form contracts containing provisions prohibited and invalidated by the CRFA.

80. By offering customers form contracts containing provisions prohibited and invalidated by the CRFA, Defendants have committed unfair or deceptive acts or practices in trade or commerce in violation of the UTPA.

81. Defendants' violations of the UTPA as described herein were and are intentional.

## COUNT V
### Violations of the Maine Unfair Trade Practices Act

82. The State incorporates herein the allegations of the foregoing paragraphs.

83. At all times relevant to this Complaint, Defendants in connection with their trade or commerce have routinely included in standard customer contracts provisions which prohibit customers from leaving negative reviews of Liberty Bell's business and services. These provisions are imposed prior to the rendering of any services. These provisions are drafted such that they would prohibit negative reviews that were accurate or otherwise in good faith.

84. The use of these provisions in standard customer contracts constitutes unfair or deceptive acts or practices in trade or commerce in violation of the UTPA.

85. Defendants' violations of the UTPA as described herein were and are intentional.

## COUNT VI
### Violations of the Maine Unfair Trade Practices Act

86. The State incorporates herein the allegations of the foregoing paragraphs.

87. At all times relevant to this Complaint, Defendants in connection with their trade or commerce have routinely resorted to threatening customers who publish negative reviews of Liberty Bell or assert claims against Liberty Bell with litigation, damages, and penalties that lack a factual or legal basis. For example, Defendants routinely accuse customers who publish negative reviews with defamation lawsuits.

88. At all times relevant to this Complaint, Defendants have maintained a practice of using these threats to intimidate customers so that they refrain from publishing negative reviews, remove reviews that they have already published, and/or forego claims against Liberty Bell. This practice is supported and furthered by the use of the attorney@libertybellmoving.com email address.

89. Defendants' use of the attorney@libertybellmoving.com email address to communicate threats to customers is intended to create the false impression that an attorney is asserting or is involved in asserting the claims that form the basis of the threat, thus giving the claims a veneer of legitimacy.

90. These threatening, intimidating, and deceptive acts and practices by Defendants are unfair and deceptive acts or practices in violation of the UTPA.

91. Defendants' violations of the UTPA as described herein were and are intentional.

<u>COUNT VII</u>
Violations of the Maine Unfair Trade Practices Act

92. The State incorporates herein the allegations of the foregoing paragraphs.

93. At all times relevant to this Complaint, Defendants in connection with their trade or commerce have regularly included in standard customer contracts provisions that purport to release Liberty Bell from all liability prior to the rendering of any services to customers.

94. Each instance of Defendants' inclusion of such provisions in a standard customer contract constitutes an unfair or deceptive act or practice in violation of the UTPA.

95. Each instance of Defendants' enforcement or attempted enforcement of such provisions constitutes an unfair or deceptive act or practice in violation of the UTPA.

96. Defendants' violations of the UTPA as described herein were and are intentional.

RELIEF REQUESTED

The State respectfully requests that the Court enter judgment in its favor and against the Defendants and grant the following relief:

(i) Assess civil penalties against Defendants as follows:

   a. A civil penalty of not more than $46,517 for each knowing violation of the CRFA;

   b. If 49 U.S.C. § 14901 applies, a civil penalty of not less than $1,798 for each violation of the FMCSA Consumer Protection Regulations and for each additional day during which the violation continues;

   c. If 49 U.S.C. § 14910 applies, a civil penalty of $901 for each violation of the FMCSA Consumer Protection Regulations and for each day the violation continues;

   d. A civil penalty of not less than $2,392 for the first violation and not less than $5,978 for each subsequent violation of 49 U.S.C. § 14906; and

   e. A civil penalty of not more than $10,000 for each intentional violation of the UTPA;

(ii) Order restitution for any losses suffered by Defendants' customers as a result of the violations alleged herein;

(iii) Issue a permanent injunction pursuant to 5 M.R.S. § 209, 15 U.S.C. § 45b, and 49 U.S.C. § 14711 prohibiting Defendants and any of their owners, officers, directors, managers, employees, contractors, corporations, companies, agents, successors and assigns from engaging in any of the conduct alleged herein to be in violation of the CRFA, the FMCSA Consumer Protection Regulations, 49 U.S.C. § 14906, and/or the UTPA;

(iv) Award the State its litigation costs, including court costs, reasonable attorneys' fees, and reasonable expert witness fees; and

(v) Order any additional relief appropriate to remedy Defendants' unlawful conduct as alleged herein.

Dated at Augusta, Maine this 8th day of July, 2022.

AARON FREY
Attorney General


  /s/ Michael Devine
Michael Devine
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
michael.devine@maine.gov


  /s/ Laura Lee Barry
Laura Lee Barry
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
lauralee.barrywommack@maine.gov